

NUMBER 13-17-00378-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI – EDINBURG

IN RE COMMITMENT OF DONALD WAYNE HULL

On appeal from the 252nd District Court
of Jefferson County, Texas.

# DISSENTING MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Hinojosa
Dissenting Memorandum Opinion by Justice Benavides**

I write separately to respectfully dissent to the majority's conclusion that the trial court's error in admitting unreliable evidence constituted harmful error. Although I agree with the majority that the trial court erred in admitting Dr. Turner's testimony regarding the travel card, for the reasons explained below, I would conclude that the trial court's error was not harmful.

## I. STANDARD OF REVIEW

"To obtain reversal of a judgment based upon the improper admission of evidence, an appellant must show that the trial court's error was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment." *Bhatia v. Woodlands N. Houston Heart Ctr., PLLC*, 396 S.W.3d 658, 668 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (citing TEX. R. APP. P. 44.1(a); *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998).)); *see also Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004) ("Erroneous admission of evidence requires reversal only if the error probably (though not necessarily) resulted in an improper judgment.") (citing TEX. R. APP. P. 61.1 (stating that no judgment may reversed on appeal due to trial court erred unless the Texas Supreme Court concludes the complained-of error either "probably caused the rendition of an improper judgment" or " "probably prevented the petitioner from properly presenting the case to the appellate courts"); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995)). The entire record must be reviewed to determine whether the trial court's erroneous admission of evidence was harmful. *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 883 (Tex. 2014). In determining harm, courts have "sometimes looked to the efforts made by counsel to emphasize the erroneous evidence, and whether there was contrary evidence that the improperly admitted evidence was calculated to overcome." *Nissan Motor Co.*, 145 S.W.3d at 144. There is no precise test for harmless error review; however, "[a] reviewing court must evaluate the whole case from voir dire to closing argument, considering the 'state of the evidence, the strength and weakness of the case, and the verdict.'" *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008). A reviewing court should not reverse for the erroneous admission of evidence "unless the appellant can demonstrate that the judgment turns on the

2

challenged evidence." *Bhatia*, 396 S.W.3d at 668 (citing *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) ("Typically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted."); *see Kia Motors Corp.*, 432 S.W.3d at 883 (citing *Nissan Motor Co.*, 145 S.W.3d at 144) ("In analyzing whether the trial court's error was harmful, '[w]e review the entire record, and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted.'").

## II. THE EVIDENCE

Dr. Turner testified that when evaluating someone for a behavioral abnormality, he looks for risk factors "because we want to see, does this person deviate from the, quote, unquote, 'average sex offender' enough that they do exist in that small but dangerous group" and that he believed Hull was a part of this "small but dangerous" group. Dr. Turner found Hull to be a sexual deviant in the past because of Hull's sexual interests outside of two consenting adults as shown by his participation in the aggravated kidnapping with intent to rape and his behavior in prison of threatening an inmate who refused to engage in a sex act. Dr. Turner also concluded that Hull continues to be a sexual deviant because of his pedophilia or sexual attraction to children, which according to Dr. Turner, "doesn't go away."

In addition, Dr. Turner diagnosed Hull with antisocial personality disorder pursuant to the DSM-5 criteria, which is a lifelong condition. Dr. Turner stated, "the DSM-5 stands for the Diagnostic and Statistical Manual" which outlines and lays out the criteria for all mental illnesses. Dr. Turner explained that people, such as Hull, with antisocial

3

personality disorder do not care if they hurt others, do not care about the rules, and are comfortable lying to and manipulating people. According to Dr. Turner, Hull exhibits "this continued pattern of being in trouble, being punished for it and getting in trouble again. And that's what you see when you see someone with antisocial personality disorder."

### 1. Hull Pleaded Guilty to Aggravated Kidnapping

Dr. Turner testified that Hull told him about the aggravated kidnapping that occurred when Hull was either nineteen or twenty years old. Hull told Dr. Turner that he was with an accomplice, smoking marihuana, and driving around when the accomplice jumped out of the car, grabbed a girl off her bicycle, and pulled her into the backseat. Hull minimized his behavior by claiming that he drove away with the girl in the car because he was afraid. Hull also claimed the girl testified on his behalf.[1]

Dr. Turner testified that Hull's version of the events was not consistent with the records he reviewed.[2] Dr. Turner challenged Hull's statement of what occurred when the men kidnapped the victim as being inconsistent with the records he reviewed, stating: "We have transcripts from the trial where his co-defendant says what happened. We have the victim who says what happened. All of which are fairly consistent with one another. And then we have Mr. Hull's statement that he's just this innocent guy."

Dr. Turner stated, "The records indicate that [Hull] and his friend were driving [on the day of the incident] and they decided that—I believe the quote used by the co-defendant was they wanted to get some—and they used the 'P' word"; the men wanted

---

[1] The record from Hull's aggravated kidnapping case was not presented to the jury. The trial court did, however, admit a copy of the judgment convicting Hull of the offense, which documents that Hull pleaded guilty to the offense pursuant to a plea agreement with the State.

[2] Hull does not complain of Dr. Turner's reliance on those records on appeal.

4

to take a woman to a secluded area and "take turns raping her."  Dr. Turner testified that the records showed that Hull and his co-defendant first tried to abduct a girl from Lamar University; however, that girl was able to get away.  Thus, according to Dr. Turner, Hull and his co-defendant then drove to a residential area where Hull drove his vehicle around a couple of girls riding their bikes and caused the vehicle to come to a screeching halt.  Hull's co-defendant grabbed one of the girls off her bike, forced her into the backseat of Hull's car, and Hull drove away.  The victim ultimately "was able to get out and open the door" with help from "a gentleman that followed" Hull's car.  Dr. Turner testified that the "gentleman" then either hit Hull "or tried to pull him out [of the car] or something like that; but that's when the girl was able to get out of the car, was thrown out of the car."  Thus, Dr. Turner's testimony based on the criminal record completely contradicted Hull's version of what occurred.  Moreover, although Hull claims he helped the girl, he did not remain at the scene of the crime and instead drove back to his girlfriend's house where he cleaned the car.

The State asked Dr. Turner how these inconsistencies factor into his opinion.  Dr. Turner responded, "So, you know . . . we're seeing . . . denial.  We're not seeing any remorse.  We're not seeing any empathy for the victim or for the teenage girl that she was with that was scared and rode off.  So, it's pretty significant."

Although Hull had not touched the victim himself prior to her escape, Dr. Turner considered Hull's participation as showing his sexual deviancy "[b]ecause of the intent, the kidnapping the woman off of her bicycle.  The sexual assault had already begun in the backseat," "the accomplice had begun removing the victim's clothes," and "per his accomplice," their intent was to take turns raping the victim "had they not been caught."

5

## 2.    Hull's Sexual Misconduct While Incarcerated

Next, Dr. Turner testified about the four disciplinary infractions Hull received while he was in prison for the aggravated kidnapping from 1976 until 1984.  Dr. Turner explained that infractions occur when prisoners break the rules and they "get written up" with penalties.  First, according to Dr. Turner, "[i]n 1978 [Hull] received a disciplinary infraction for suggesting to an inmate that they go somewhere privately for sex.  The inmate refused; and [Hull] said, Well, what if I just take it?"  Then, "[i]n 1980, [Hull] received a disciplinary infraction for receiving oral sex from another inmate"; "in 1981, he was soliciting sex from another inmate for physical protection from other inmates"; and there was another incident that was ultimately found to be consensual sex between Hull and some other inmates.  Hull testified that he was "written up for inciting sex malpractice by threat" for the 1981 incident and was placed on administrative segregation.  Dr. Turner stated that Hull claimed he "had no memory" of those incidents.  Dr. Turner explained that his assessment considered these infractions because breaking the rules in prison involving sexual behavior and "threatening another inmate or inmates for sex is very important when we're talking about something like a behavioral abnormality, which is a condition that affects their ability to control their behavior."

## 3.    Hull's Large Victim Pool

Dr. Turner stated that "the victim pool" of an offender can be "rather clear and isolated"; for example if "[t]hey're attracted to female children . . . that's who they offend against."  However, Hull "has offended against multiple female children, he's also offended against an adult female [when he committed the aggravated kidnapping], and then now we have evidence of offenses against adult males," making Hull's victim pool

6

"quite large." The State asked why Dr. Turner would consider the consensual prison sexual infractions as part of his analysis, and Dr. Turner said, "Well, if—if an inmate has sex with another inmate, it's against the rules. So, it's an indication of an inability or an unwillingness to follow the rules. But most importantly, in these disciplinary infractions is this [n]otion that he was making threats and he was forcing himself on other inmates."

### 4.    Dr. Turner's Diagnosis of Pedophilic Disorder

According to Dr. Turner, Hull continued to engage in sexually deviant behavior after he was released from prison by sexually abusing a twelve-year-old girl and eleven-year-old girl. Dr. Turner testified that, when he interviewed Hull about the children, Hull "denied offending against them, and he said that they were very starved for affection from their caregiver; so, he would hug them a lot . . . ." Dr. Turner stated Hull has provided inconsistent statements about his relationship with the children in that he told Dr. Turner that the children referred to him as "grandpa," but when the State asked him, "he denied telling [Dr. Turner] that the children called him 'grandpa.'" Dr. Turner opined that when a person is telling different people a different story, "it starts to provide further evidence that they are being untruthful; I think that Mr. Hull is untruthful to the extent that he has problems remembering who he said what to at what time . . . ."

The twelve-year-old child claimed Hull touched her vagina underneath her underwear, and she reported the incident immediately. According to Dr. Turner, Hull denied any contact with the twelve-year-old girl. After the twelve-year-old reported that incident, the eleven-year-old child reported that Hull had been sexually abusing her by "rubbing her breast, rubbing her vagina, exposing his penis, asking her if she liked it—as well as offering her money or ice cream or pickles and things like that." However,

7

according to Dr. Turner, Hull claimed that when the eleven-year-old girl came to his house, "he slipped on some water . . . . he reached out to stop himself; and that's when he accidently touched her vagina." Dr. Turner opined that Hull's continued and repeated denial of committing the offenses is "very, very important" because "that really, really is going to impact his ability to progress in treatment. It's evidence of lack of remorse; and so, it's problematic for a variety of reasons." Hull pleaded "guilty" to two counts of indecency with a child as a repeat felony offender, and the trial court sentenced him to twenty-five years' confinement despite Hull's claim now that he slipped on water in his home and to break his fall grabbed the child's waist and did not intentionally touch her vagina.[3]

Dr. Turner opined that Hull's actions indicate "a pattern of sexual attraction to children" that "occurred over a period of at least six months with two victims" that "leads us to a whole new realm of sexual deviance in terms of pedophilia." Dr. Turner stated that Hull's behavior of threatening to kill the victims' families showed Hull's "antisociality," "is evidence of poor behavioral control, evidence of some anger issues . . . [and] evidence of generally poor decision making . . . ." Dr. Turner said, "[S]o, here's another instance where he's, you know threatening people."

The State displayed the diagnostic criteria for pedophilic disorder for the jury, and Dr. Turner explained that the diagnosis "comes from the DSM-5." Dr. Turner explained that the criteria for pedophilic disorder are as follows: (1) having a sexual attraction to prepubescent children over a period of six months; (2) which causes the person "a great

---

[3] During his testimony, Hull denied being alone with the eleven-year-old child and denied that he touched her inappropriately. Again, however, Hull pleaded "guilty" to that offense.

8

amount of interpersonal distress or it causes problems in their life because they've acted out on it"; and (3) there is a significant age difference. Dr. Turner testified Hull met each criterion for pedophilic disorder because the court documents establish that Hull sexually assaulted a child under thirteen years of age for a period of at least six months, he was incarcerated for sexually assaulting two children causing him a great amount of interpersonal distress, and he was forty-four and forty-five when he committed the offenses against an eleven-year-old child and a twelve-year-old child constituting a significant age difference between Hull and the children. Dr. Turner opined that Hull's disorder is a chronic condition in that "[a] pedophilia is not something that happens for six months and then goes away. If it's happening over a period of time and it's meeting the criteria for a pedophilic disorder, then it's going to be a chronic condition."

Dr. Turner opined that Hull's sexual deviance is more extensive than just the pedophilic disorder diagnosis because "there is extensive evidence of him forcing himself on people sexually based on the other offenses . . . [t]hat sort of gets into the area of possibly some sadistic urges, which is gaining pleasure from hurting the other person or forcing or humiliation of causing pain." However, Dr. Turner did not diagnose Hull with sadism. Still, he opined that "there is more to his overall picture of sexual deviance than the pedophilic disorder" because "he has been willing to violate others, to violate adults, to violate women, to violate men and threaten them for his own sexual gratification."

5.    **The Diagnostic Tests**

In his evaluation of Hull, Dr. Turner used the PCL-R diagnostic test to determine whether Hull is a psychopath. The total possible score is forty, which Dr. Turner explained "would be like the Ted Bundys of the world." The test requires the tester to score the test

9

taker "on 20 items that have been shown through research to be present in people with this personality construct." Dr. Turner testified that the statute allowing for civil commitment "indicates you have to assess for psychopathy." Dr. Turner explained that although the PCL-R was not designed to predict whether a person would re-offend, "lo and behold, it turns out that people that have a high degree of psychopathy are also at a high risk to re-offend sexually if they have prior sex offenses. So, it's turned out to be a good and solid risk assessment tool . . . ." Dr. Turner's score of Hull was twenty-nine, which "means that out of 40 possible points, [Hull] has 29 points that would be evidence of psychopathic personality construct." Dr. Turner explained that research indicates that "the most predictive part of the PCL-R in terms of predicting risks" consists of five of the PCL-R items. The combined maximum score of these five items is ten, and Hull scored a nine out of ten on them.

Dr. Turner opined that "what we have here is the very definition of a behavioral abnormality . . . we have someone that has some condition that makes him likely to engage in acts of sexual violence." Dr. Turner believed Hull is a menace to the health and safety of another person "[b]ecause . . . he still has sexual deviant interests," he is "still antisocial," "and essentially, his entire life all he's done is commit sex offenses, be punished and commit more sex offenses." Dr. Turner opined that aggravated kidnapping as committed by Hull and indecency with a child are predatory acts of sexual violence.

Moreover, Dr. Mauro testified that, although she disagreed with Dr. Turner's diagnosis of antisocial personality disorder, she did not believe it was unreasonable for Dr. Turner to make that diagnosis. And when asked by the State if it was unreasonable for "a mental health professional to have found Mr. Hull to have both pedophilic disorder

10

and antisocial personality disorder," Dr. Mauro said, "No. It's not unreasonable." Dr. Mauro also stated that she employed the same or similar methodology used by Dr. Turner; she believed she reviewed the same information, including the records of Hull's past offenses; and she agreed with the State that Hull is a sexual recidivist. Dr. Mauro said, "Well, [Hull] shouldn't be alone [around] any children."

### III. DISCUSSION

Here, Dr. Turner, as set out above, did not rely solely on the travel card to form his opinion that Hull suffers from a behavioral abnormality. Dr. Turner relied on, among other things, details of Hull's other sexual crimes, details of Hull's behavior in prison, Hull's pattern of denying and minimizing his participation in the offenses, Hull's lack of remorse, and his assessment of Hull's psychological tests—none of which Hull challenges on appeal as causing an erroneous judgment. Dr. Turner also relied on his interview with Hull. Thus, the jury heard extensive evidence, aside from the travel card, supporting its finding that Hull suffers from a behavioral abnormality as further explained below.

Dr. Turner explained that to evaluate a person as having a behavioral abnormality, he uses the definitions as set out in the statute. He stated that he looks "at risk factors that have been supported and researched to increase someone's likelihood of offending" and examines the individual's "current attitude about [his] offenses and offense history and attitude about sex and sex offending in general." Dr. Turner stated that having risk factors such as sexual deviance and antisocial personality disorder "raises a person's risk of re-offending" based on published research that has "been reviewed by other experts and found to be sound and reliable."

Dr. Turner agreed with the State that the *details* of Hull's sexual offenses are

11

significant in determining whether he suffers from a behavioral abnormality. Dr. Turner conceded that there are no details available concerning the sexual offense mentioned in the travel card and testified that although he relied on the travel card to show that Hull committed a prior sexual offense, he did so merely as evidence of Hull's willingness to re-offend to satisfy his own sexual urges. However, the jury heard detailed evidence that Hull committed aggravated kidnapping, went to prison, threatened another inmate for sex, was released, and re-offended two times against two child victims. Thus, there is other evidence showing Hull's willingness to re-offend for his own sexual urges even discounting the travel card.

Considering Hull's admitted sexual assaults of two children, Dr. Turner opined that Hull is a sexual deviant because of his sexual attraction to children which "doesn't go away." Dr. Turner stated that Hull met each criterion from the DSM-5 for pedophilic disorder, which is a chronic condition. Dr. Turner also based his opinion that Hull is a sexual deviant on Hull's pleading guilty to and thus admitting that he committed the offense of aggravated kidnapping of a girl with the intent to rape her. In addition, Dr. Turner testified that Hull's attitude toward women now, his lack of remorse and empathy for his victims, and his denial of his offending even while pleading guilty is evidence of Hull's "continuing deviance." Dr. Turner stated that Hull told him that "all women are prostitutes because you pay for" the "'P' word." Dr. Turner considered Hull's statement inappropriate, especially because he made the comment to Dr. Turner during his risk assessment of Hull. Although Dr. Mauro disagreed with Dr. Turner's diagnosis, the jury was free to believe Dr. Turner.

In addition, after performing psychological tests, Dr. Turner diagnosed Hull as

12

having antisocial personality disorder/antisociality pursuant to the DSM-5 criteria. Dr. Turner explained that "[a]n antisocial personality disorder is a personality construct that is characterized by someone who is out for themselves, who is very entitled—I want what I want," and a person with antisocial personality disorder does not "care" about the rules or if he hurts other people. According to Dr. Tuner, such a person lacks empathy and is comfortable lying, manipulating other people, conning, and rule breaking. Dr. Turner stated that he sees evidence that Hull has antisocial personality disorder because Hull has a willingness to victimize other people for his own sexual gratification, he is not remorseful, and does not admit his offenses. Dr. Turner gave Hull a score of "2" on the Static-99R test, and Dr. Mauro gave Hull a "1." Dr. Turner testified that he would conclude that Hull suffers from a behavioral abnormality even with a score of "1."

Next, when Dr. Turner administered the PCL-R, Hull scored a twenty-nine, while Dr. Mauro scored Hull with a twenty-three. According to Dr. Turner, the threshold score to qualify as a psychopath is twenty-five, and Hull's average score on the PCL-R performed by Dr. Turner and Dr. Mauro is twenty-six.[4] Dr. Turner testified that the term "behavioral abnormality" "is not a mental health term" and is instead "a legal term, just like insane is a legal term but it has a mental health connotation." Dr. Turner explained that the statute states "very clearly" that "a diagnosis of a mental illness is not a behavioral abnormality." Dr. Turner testified that the statute instead requires a determination of whether the individuals have "some kind of condition that impairs their ability to control themselves and makes them likely to commit another sex offense."

---

[4] Dr. Mauro testified that to qualify as a psychopath, a person must score a thirty on the PCL-R. However, Dr. Mauro found that Hull has some traits associated with psychopathy and stated that she found that Hull had mixed psychopathic traits.

13

Moreover, Dr. Turner stated that he gave Hull a "2" on the question regarding "poor behavioral controls" because of Hull's juvenile offense as set out in the travel card, as well as Hull's juvenile street fights, his suspension from school on multiple occasions, and his continuous rule breaking, which has continued. Thus, although Dr. Turner listed the juvenile rape offense as one of his reasons for giving Hull a "2" for "poor behavioral controls," Dr. Turner had other justifications for providing that score. Assuming for sake of argument that Dr. Turner should have given Hull a score of "0" for "poor behavioral controls," Dr. Turner's score of the PCL-R would have still been twenty-seven, and the average of Dr. Mauro's score and Dr. Turner's score would have been twenty-five. In addition, according to Dr. Mauro, in a third PCL-R test, administered by a risk evaluator employed by TDCJ, Hull scored a twenty-six.

Nonetheless, as previously stated, Dr. Turner also diagnosed Hull with sexual deviance and antisocial personality disorder, which Dr. Turner explained were problematic risk factors. Dr. Turner could not have relied on Hull's juvenile offense as stated by the travel card when he made those diagnoses because the travel card did not contain any details concerning that offense.[5] Moreover, Dr. Turner testified that Hull is currently a sexual deviant, a diagnosis which does not depend on Hull's juvenile record.

Dr. Turner opined that "[i]t's extremely problematic" if a person has antisocial personality disorder and is also a sexual deviant because

[i]f someone has a sexual deviant interest, some attraction to something that is not consenting—another consenting adult, that's a problem. If they

---

[5] On cross-examination by Hull's trial counsel, Dr. Turner explained that to diagnose a person with antisocial personality disorder, there must be evidence of the disorder before the age of fifteen. Dr. Turner testified that in Hull's case, "there were several instances of arrests noted as a juvenile with periods . . . of supervised release that he violated" and "[t]here was a history of suspensions from school and a history of fighting." Dr. Turner did not mention that he relied on the travel card or the juvenile rape when he made this determination.

14

have antisociality to a high degree, they are willing to victimize other people. They are willing to break the rules. They can do it without feeling any remorse. They can go through life and not admit it to themselves and make a statement like he made at his deposition, "I have a clear conscience." That's a problem.

If they exist alone, sometimes people with sexually deviant interests don't have enough antisociality to act on those interests. They couldn't see themselves hurting someone else. They couldn't live with themselves for that. So, maybe they seek treatment for it or maybe they keep it a secret or maybe they join a . . . [special] community where it's a consensual thing with safe words and so on and so forth. If someone is antisocial and they are willing to victimize other people and they are willing to lie and manipulate and there's no sexual deviance, then we see them at a risk for joining politics or you know, other things likes [sic] that, white collar crime, so to speak Bernie Madoff. But there's no indication that they're going to act out sexually.

Dr. Turner concluded that in this case Hull's sexual deviance is fueled by his antisocial personality, which increases his risk level. On cross-examination by the State, Dr. Mauro agreed that if a person is diagnosed with antisocial personality disorder and sexual deviance, then that person has a greater risk to reoffend.

Dr. Turner considered Hull's admitted aggravated kidnapping as showing that Hull has a higher risk to re-offend and is a sexual deviant due to his participation in kidnapping a stranger with the intent to rape her. Dr. Turner also considered Hull's threat to kill the children's families after the children made their outcries about Hull's sexual abuse as indicative of Hull's antisociality—one of the two risk factors Dr. Turner believed shows that Hull is willing to victimize other people. In addition, Dr. Turner considered Hull's admitted behavior in prison where he threatened another inmate with violence for refusing to perform a sex act as showing that Hull was willing to break the rules in prison, which according to Dr. Turner indicates Hull has an antisocial personality disorder. Dr. Turner also considered Hull's *nonsexual* juvenile arrests where Hull was "placed on supervised

15

release and violated it." Dr. Turner specifically clarified that he was speaking of Hull's *nonsexual* juvenile record, which is not listed on the travel card. He stated that "this continued pattern of being in trouble, being punished for it and getting in trouble again" shows "someone with antisocial personality disorder." The same can be said for Hull's adult behavior in prison, in committing aggravated kidnapping, and then reoffending by committing sexual assault of two children.

Dr. Turner did not rely on the travel card in his assessment of Hull when he made the above-stated determinations. Dr. Turner concluded that Hull is a sexual deviant due to his opinion that Hull has a pedophilic disorder, Hull's participation in the aggravated kidnapping with the intent to rape, and Hull's threatening an inmate to perform a sex act. Dr. Turner testified that he found Hull's juvenile record as gleaned from the travel card as merely "*more* evidence" of Hull's sexual deviance and antisociality. In other words, discounting the travel card, Dr. Turner found substantial other evidence supporting his conclusion that Hull is a sexual deviant and has antisocial personality disorder, which are, according to Dr. Turner, two risk factors of reoffending, and the travel card merely adds to that evidence. In addition, the State asked Dr. Mauro if she agreed "that Hull's sexual offenses are sexually deviant," and she replied that she prefers to "avoid that term in explaining behavior. But they [Hull's crimes] are considered sexually deviant under the law and clinically." Dr. Mauro also acknowledged Hull's juvenile delinquency in the PCL-R by giving Hull a "2," which means that the trait is there.

In his determination that Hull suffers from a behavioral abnormality, Dr. Turner placed some emphasis on Hull's denial of his offenses. For example, Hull's testimony that he drove away when his co-defendant grabbed a stranger off her bike because he

16

was scared is dubious and was discredited by Dr. Turner's testimony, Hull's behavior after the girl escaped, and his own decision to plead guilty to that crime. Dr. Turner found Hull's denial of his participation in the aggravated kidnapping and lack of remorse as "pretty significant." Hull now claims that he was trying to help the victim during the aggravated kidnapping, but Hull pleaded "guilty" to the offense and there is evidence that the men intended to take turns raping the girl. *See* Tex. Health & Safety Code Ann. § 841.002(8) (defining sexually violent offenses as including aggravated kidnapping if the person intended to abuse or violate the victim sexually).[6] Although the majority notes that "Hull denied committing any sexual misconduct in prison," Hull testified that he pleaded guilty to threatening another inmate for refusing to perform a sex act and spent some time in administrative segregation.

Hull also denied that he sexually assaulted the two children; however, again, Hull pleaded guilty to both counts, and Hull admitted to Dr. Turner that he touched the eleven-year-old child's vagina. Hull's slip-and-fall explanation of why he touched the child's vagina is farfetched. Dr. Turner stated that Hull's continued denial of his offenses is evidence of his lack of remorse and is "problematic for a variety of reasons." Dr. Mauro acknowledged that Hull's version of the sexual assault of a child offenses "certainly differs significantly from the allegations made by the children, as well as the actual convictions."

Dr. Turner explained that Hull's substance abuse factored into his opinion that Hull suffers from a behavioral abnormality because "[i]t speaks to antisociality. It speaks to a willingness to ignore the rules and not obey the rules. It can also speak to . . . behavioral

---

[6] Hull does not argue on appeal that the aggravated kidnapping offense should not be considered in Dr. Turner's analysis.

17

control problems, impulse control problems." Dr. Turner would still consider Hull as having a behavioral abnormality even if he never uses drugs or alcohol again.

Thus, the jury heard evidence that Hull had a behavioral abnormality based not only on the offenses he committed but also on his behavior in prison and Hull's answers to psychological tests. The jury also heard evidence from Dr. Mauro that the travel card was unreliable because it did not include any information regarding who wrote it and it had no details about Hull's juvenile offense. In addition, Dr. Mauro told the jury that she considered the juvenile offense in her evaluation of Hull, and she believed he did not suffer from a behavioral abnormality. Therefore, I do not believe that the jury relied solely on the travel card in finding that Hull suffers from a behavioral abnormality. To the contrary, the jury's finding was based on the totality of Hull's criminal history and on his own admissions—not on one event noted in the travel card that contained no details. I also disagree with the majority's conclusion that "the repeated references to Hull having allegedly raped a fifteen-year-old girl must have necessarily impacted the jury's reconciliation of the conflicting testimony."

Moreover, Dr. Turner testified that even "set[ting] aside" Hull's juvenile offense which was documented on the travel card, he would still have concluded that Hull suffers from a behavioral abnormality based on Hull's other prior offenses and behavior.[7] *See* *U-Haul Int'l, Inc.*, 380 S.W.3d at 132 ("Even if the trial court abused its discretion in admitting certain evidence, reversal is only appropriate if the error was harmful, i.e., it

---

[7] In addition, Dr. Mauro testified that even taking the alleged juvenile offense as documented on the travel card into account along with Hull's other offenses, she does not believe Hull has a behavioral abnormality. Dr. Mauro said that she "considered that some type of sexual offense happened in his juvenile history," but she "did not know the details of that [offense]."

probably resulted in an improper judgment."); *Nissan Motor Co.*, 145 S.W.3d at 144; *see also* TEX. R. APP. P. 44.1. Dr. Turner provided extensive expert testimony regarding Hull's psychological disorders including his pedophilic disorder, antisocial personality disorder, and psychopathy.

Although, as the majority points out the State and Dr. Turner referenced the travel card on several occasions, Dr. Turner did not rely solely on the travel card to make his determination that Hull suffers from a behavioral abnormality. In fact, Dr. Turner testified that he even if he "set aside" the travel card, he would have concluded that Hull suffers from a behavioral abnormality. Therefore, I believe that the travel card did not sway the jury to decide that Hull has a behavioral abnormality given the other significant evidence presented of Hull's psychological disorders and admitted sexual crimes. The allegations contained in the travel card are vague and insignificant compared to the overwhelming evidence regarding Hull's additional offenses of aggravated kidnapping and indecency with a child. Moreover, there is nothing in the record showing that the State offered Dr. Turner's testimony regarding Hull's juvenile offense as set out in the travel card to overcome contrary evidence presented by Hull. Instead, Dr. Turner testified that he relied on the alleged juvenile crime to determine whether Hull had a behavioral abnormality and stated that even setting aside that crime, he still believed Hull suffers from a behavioral abnormality.

## IV. CONCLUSION

Accordingly, I do not agree with the majority that Hull has demonstrated that the judgment *turns* on the admission of the travel card. *See Bhatia*, 396 S.W.3d at 668; *see also* Tex. R. App. P. 44.1; *Kia Motors Corp.*, 432 S.W.3d at 883; *Interstate Northborough*

19

*P'ship*, 66 S.W.3d at 220. Therefore, I would conclude given the state of the entire record and the properly admitted evidence that Hull has not shown that the trial court's error was reasonably calculated to cause and probably did cause an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *U-Haul Int'l, Inc.*, 380 S.W.3d at 132. For these reasons I respectfully dissent.

GINA M. BENAVIDES,
Justice

Delivered and filed the
18th day of July, 2019.